UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**THERESA MARIE YOUNG**,  Case No. 6:12-CV-02133-KI

        Plaintiff,  OPINION AND ORDER

  v.

**COMMISSIONER SOCIAL SECURITY ADMINISTRATION**,

        Defendant.


    Alan Stuart Graf, P.C.
    208 Pine St.
    Floyd, VA 24091

        Attorney for Plaintiff

    S. Amanda Marshall
    United States Attorney
    District of Oregon

Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR 97201-2902

Kathryn A. Miller
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900, M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

KING, Judge:

Plaintiff Theresa Young brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Young filed an application for DIB on August 10, 2009. The application was denied initially and upon reconsideration. After a timely request for a hearing, Young, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on June 16, 2011.

On July 20, 2011, the ALJ issued a decision finding Young was not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on September 19, 2012.

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. Id. (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. Id.

## THE ALJ'S DECISION

The ALJ concluded Young suffered from bipolar disorder and post-traumatic stress disorder, but that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ found Young had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but that she did have some nonexertional limitations. These included unskilled work, with no public contact, and only occasional co-worker contact with no teamwork. Given this RFC, the ALJ determined Young could not perform her past work, but could perform work as Soft Good Sorting, Linen Folding, and Hand Packaging.

## FACTS

Young was 52 years old on her alleged disability onset date of December 12, 2008, which is the date she was laid off due to a plant closure. She has a high school education, although she did not graduate. She has worked as a cabinet assembler, finish sander, and interior paneler.

Before she was laid off, David Knowlton, M.D., treated her for depression. In August 2007, she reported doing well off of anti-depressants, but she reported stress and a dysfunctional relationship in March of 2008. In April, she sought treatment for neck pain, reporting a previous C6-7 fusion in 2006. Young began taking amitriptyline for her depression that month and reported doing well in May.

Page 5 - OPINION AND ORDER

After she was laid off, she started treatment at Volunteers in Medicine Clinic, and was seen there from approximately May 11, 2009 to November 9, 2010. During treatment sessions, she explained her father had died when she was 13 years old, and that she had been raped, but that she had always been "mentally quite sharp." Tr. 304. She reported being on and off anti-depressants and doing well for awhile until a few years ago when her boyfriend moved in with her. She reported crying a lot, having trouble sleeping, and being unable to get a job. She was started on a prescription of Lexapro.

After she began Lexapro, she reported feeling a " a lot better," described stress from losing her job, and, although she reported short-term memory problems, she was able to "recite her medications quite handily." Tr. 303. At her mental health intake evaluation, in June 2009, she reported feeling depressed since being laid off, and that she had been able to work "numerous jobs over the years and also was primarily responsible for raising her children." Tr. 300. She described racing thoughts and confusion her entire life, but "[w]hen employed, she did not have similar problems" because she knew her job well. Tr. 299. She wanted to return to work "because she enjoys working and feels better about herself when employed." Tr. 301. She was not at the point of experiencing panic attacks, and Peter B. Schur, Ph.D., believed her complaints of racing thoughts and troubles concentrating were due to "situational stressors[.]" Tr. 301. He assigned a GAF score of 55.[1]

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 51 to 60 means "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").

Young was hospitalized for confusion on July 24, 2009, where she was diagnosed with encephalopathy, likely secondary to amitriptyline use. She returned a few days later when her family brought her back. The emergency room physician noted paranoia, constant rhythmic movement of her hands, and rocking, and that Young thought her boyfriend was going to get her. She was discharged after Elavil was stopped and she "promptly improved in her mental status" overnight. Tr. 268. She agreed to seek outpatient services for her depression.

Young reported agitation and domestic violence at the hands of her boyfriend in August 2009, and she was restarted on Lexapro and Seroquel again. Somehow the Lexapro had dropped off her list, although "[a]s recently as June, providers reported her being on it and feeling as though she was improving." Tr. 297. In September, she reported feeling "much better," but wondered about increasing the Lexapro because she felt her mood "flattening out and getting somewhat depressed again[.]" Tr. 336. She noted less interest in completing puzzles, when she is normally "quite infatuated" with them. Tr. 336. In October, she reported her depression was helped "significantly" with the Lexapro and Seroquel. "In general, she feels like her condition has stabilized and she is quite happy with her current regimen." Tr. 335. She did not raise her mental health at her November appointment.

It was not until March 2010 that she was seen again for panic attacks, depression and bipolar tendencies, but she had been to a job interview and reported being in good spirits in April. In June, her provider reflected "most of her chronic problems have stabilized including her mental health." Tr. 374. She was "normal" in August. She described a "positive stressor" of traveling to Reno in September. She found it exhausting because she walked a lot, was stimulated, and did not get enough sleep, but "she did have some fun, too." Tr. 376. When she

returned, she had to have her dog put down, which agitated her. She was prescribed Xanax for breakthrough anxiety. In November, she reported feeling like a loser, hopeless and helpless, and "bored to death, can't find a job–it's killing me[.]" Tr. 381. Her therapist noted her "anxiety and depression 'worse' since out of work over 2 yrs ago. Much is situational. Very inactive, bored. Easily come to tears but as easily was smiling and laughing. Full range of affect–more sad at times than dep." Tr. 381.

Young established care with Diane Kimball, ARNP, on February 4, 2011. She told Kimball her memory problems were bothering her most; her depression and anxiety were controlled. Tr. 361.

On March 10, 2011, Elizabeth Perrine, MA, QMHP, and Ruthann Duncan, LMFT, at the Center for Family Development performed a mental health/psychosocial assessment of Young. Young reported "ongoing life stressors and transitions for quite a while." She described past sexual abuse, a troubled childhood, and losing her job. "She . . . felt a lot of pride in this job, has had difficulty finding new employment, and this has led to financial stress." Tr. 460. When asked to describe her individual skills, she reported having "skills to offer in a job." Tr. 463. She was diagnosed with PTSD on Axis I, with a GAF of 50,[2] and with a "prognosis [as] moderate to respond affirmatively to counseling." Tr. 464.

Young sought therapy from the Center for Family Development from March through July 2011. In March and early April, she described her childhood trauma, explored her relationship problems, described her financial and health-related stress (she was worried about the effect of

---

[2] A GAF of 41 to 50 means "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job.)" DSM-IV 34.

Page 8 - OPINION AND ORDER

acid reflux on her esophagus), expressed an interest in lowering her anxiety and depression, and reported enjoying cooking and spending time with her granddaughter.

Young began care with Carolyn M. Hartman, M.D., on April 11, 2011, and reported feeling sad and anxious. Young believed her Lexapro was not helping. Hartman diagnosed depression, and a history of bipolar disorder and PTSD based on Young's report, with a GAF score of 50.

From April 15 and beyond, during her sessions at the Center for Family Development, Young reported "feeling less stressed overall with the higher doses of her anti-depressants," she reported "feeling better with her mood stabilizer medication," feeling "mellow" but with stress from her financial and health situation, feeling that her mood stabilizer was working as she "wakes up in a good mood," and that her anxiety was managed by medicine. Tr. 469-72, 562-565. She was walking in the nice weather, cooking and cleaning, and enjoying spending time with her granddaughter.

Dr. Hartman treated Young again on April 29, where she added Lamictal to the Lexapro and Seroquel. They talked about Young's symptoms–discouraged about the future, irritated, trouble making decisions–and strengths–intelligent, cooperative with her treatment providers, and determined. On May 13, Young reported the Lamictal made her feel a little better and she was hopeful. She also noted continuing struggles with "multiple stressors, including financial stress and limited supports, chronic health problems, and chronic pain." Tr. 536. By June 6, Young was "doing fairly well in terms of her mood and her functioning. The theme of the session is coping with multiple stresses and losses and safety." Tr. 534. Dr. Hartman continued to diagnose depression, bipolar, noting the "mood reasonably stable." Id. She also diagnosed

Page 9 - OPINION AND ORDER

PTSD, commenting "this appears reasonably stable and the patient continues to struggle, however." Id.

On June 15, 2011, Dr. Hartman completed a Mental Residual Functional Capacity in which she opined Young was moderately limited in understanding and remembering detailed instructions, in maintaining attention and concentration for extended periods, in performing activities within a schedule or maintaining regular attendance, in the ability to make simple work related decisions, in maintaining socially appropriate behavior, in being aware of normal hazards, and in the ability to travel to unfamiliar places. Dr. Hartman believed Young was markedly limited in working with others, completing a normal workday without interruptions, interacting with the general public, accepting instructions and criticism from supervisors, responding to changes in the work setting, and setting realistic goals. Dr. Hartman found a prognosis "difficult to predict with certainty." Tr. 533. She also estimated Young would have "lifelong symptoms with intervals of improvement." Id.

## DISCUSSION

I.  Medical Evidence

Young challenges the ALJ's evaluation of Dr. Hartman's MRFC. The ALJ gave little weight to the opinion. Although the ALJ agreed Young's problems with concentration and working around others needed to be accommodated in future work, he thought he had appropriately accounted for those difficulties by limiting her to unskilled work and by limiting or precluding contact with others. He disagreed with Dr. Hartman's opinion that Young could not complete a normal workday and workweek. He noted,

> the treatment history indicates that claimant has experienced many of her alleged symptoms since her youth but also that she has been able to maintain full-time employment since that time.  Dr. Hartman's opinion does not seem to consider or explain this.  Rather, Dr. Hartman seems to acknowledge that claimant has experienced "lifelong symptoms with intervals of improvement."

Tr. 33.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066.

The parties dispute which standard the ALJ was required to meet in rejecting the portion of Dr. Hartman's opinion finding Young unable to maintain a schedule or complete a normal workday or workweek; Young argues the ALJ's reasoning needs to meet the clear and convincing threshold while the Commissioner advocates for the specific and legitimate standard. Since Dr. Hartman's opinion is directly contradicted by the DDS non-examining physicians–one of whom found Young's impairments not severe and the other of whom opined the impairments were severe but not expected to last for 12 months–the ALJ was required to give only specific and legitimate reasons, supported by substantial evidence, to reject Dr. Hartman's opinion.  See

Page 11 - OPINION AND ORDER

Widmark, 454 F.3d at 1066-67 (state agency reviewing physician contradicted examining physician; specific and legitimate standard applied).  While Young is correct that the state agency opinions alone cannot constitute substantial evidence for rejecting Dr. Hartman's analysis, the opinions "may suffice to establish a conflict among the medical opinions[.]"  Id. at 1067, n.2.

      Here, the ALJ did not rely on the state agency opinions at all.  To the contrary, he found Young's mental impairments were severe, accounted for her treatment history, and accommodated her mental limitations.  Tr. 32.  In rejecting Dr. Hartman's opinion, the ALJ pointed to Young's treatment history, which reflected long periods of doing well when medicated and which connected her symptoms to situational stressors.  Young contends the ALJ cherry-picked the record, but my recounting of her history above underscores that when she was medicated properly she felt well.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings").

      In addition, the ALJ relied on Young's work history, despite her life-long struggle with her mental health impairments.  Young takes issue with the ALJ's phrasing–that Young "has been able to maintain full-time employment" since her youth, despite her mental health symptoms–contending it is not supported by substantial evidence.  Tr. 33.  Young points out that she earned only $6.25 in the year in which she turned 18, and that she did not work again until she turned 30.  Between the ages of 30 and 40, she says she worked well below substantial gainful activity ("SGA") levels.  Tr. 125.  She says she earned just over SGA in 1997 and 1998, but below SGA again from 1999 to 2003.  She was only able to earn substantially above SGA from 2004 through 2008.

The ALJ may have clumsily phrased his conclusion–Young has not been working "since" her youth given that she started working at 30 years old. However, she has been working consistently since 1997 until her plant closed in 2008 and, contrary to Young's calculations, has earned above SGA and sometimes double or triple SGA since 1997, with the exception of 2000 through 2003. See http://www.ssa.gov/OACT/cola/sga.html (setting SGA at $6,000 a year in 1998 when Young earned $16,503; setting SGA at $7,200 in 1999 when Young earned $7,911). Additionally, she represented working 40 hours a week at most of the jobs since 1997. Tr. 193-198. The ALJ's interpretation of Young's work record is supported by a rational reading of the record, and it is a specific and legitimate reason to discount Dr. Hartfield's opinion. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (Commissioner's interpretation of the record need only be rational); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999) (ALJ may reject physician's opinion that conflicts with demonstrated activities).

The ALJ did not err in rejecting a portion of Dr. Hartman's opinion.

II.     Young's Credibility

Young testified that she has suffered from depression and anxiety all her life, that she is tired all the time and stays in bed until the afternoon, that she has breakthrough anxiety four times a day, and that she has been unable to maintain full-time employment because of her depression. She reported always having trouble at work. She reported problems with concentrating and focusing, and problems finishing tasks.

The ALJ accounted for Young's statements about her concentration and focus problems, as well as her inability to get along with others, in the RFC he crafted.

With respect to the remainder of her testimony about her depression and anxiety, the ALJ noted Young's concession that her treatment providers have "really helped me," that her treatment history reflects medication has alleviated her symptoms, that her depression is related to situational stressors, inactivity and boredom, and that even though Young has experienced anxiety and depression since her youth, "she has been able to maintain full-time employment since that time." Tr. 31.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. Id. The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

Page 14 - OPINION AND ORDER

The ALJ provided ample clear and convincing reasons to find Young's testimony about her limitations unreliable. Although Young contends her improvement was sporadic, the medical history I report above reflects long periods of normalcy. Young suggests the term "doing better" is a relative term and is not equivalent to an ability to work an eight-hour day. However, as the ALJ pointed out, her last job ended because of a plant closure. She left her previous employer for a better wage and because she had not received a promised raise. Additionally, although "doing better" may be relative, the ALJ pointed out Young was "pleased" with her medications, that she was "stable," felt "normal," and that she was able to do a job interview. Tr. 31. The inconsistency between Young's testimony and her statements to her medical providers is a clear and convincing reason to find Young unreliable. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (inconsistent statements concerning the symptoms is credibility factor).

As I indicate above, I also find the ALJ could properly rely on Young's work history to find her testimony unreliable. Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (claimant left his job because he was laid off was clear and convincing reason for disregarding testimony).

Finally, Young takes issue with the ALJ's reliance on inconsistent remarks to support his finding that no physical limitations preclude her from working. In support of his finding, the ALJ noted Young's report of only "intermittent neck pain" and that she had been "feeling well" in June 2010, that she had been able to go on vacation to Reno, and that she had failed to comply with an exercise routine. Although the ALJ did not discuss the fact that Young developed swelling in her legs from walking in Reno, the medical record reflects she developed the swelling from "walking on concrete in her flip flops" in the heat and that the swelling went down the next day. Tr. 376. Any error of the ALJ to note this fact is harmless given that the record also reflects

Page 15 - OPINION AND ORDER

Young has had no trouble with edema outside of this event, and Young points to nothing in the record that would support any physical limitations due to swelling in her legs. The ALJ gave clear and convincing reasons for concluding Young has no physical limitations that would keep her from working. Tommasetti, 533 F.3d at 1039 (inconsistent statements and unexplained failure to follow a prescribed course of treatment are credibility factors).

In sum, the ALJ gave clear and convincing reasons, supported by substantial evidence in the record, to find Young's testimony about her limitations less than credible.

III.     Lay Testimony

Young finally challenges the ALJ's rejection of her daughter's testimony. Judy Thorogood submitted a Third Party Function Report in which she noted Young's day consisted of: waking up, drinking coffee, taking medications, taking care of the dog, performing housework, eating, doing puzzles, having dinner, taking night-time medications, having a bath, and then going to bed. She noted Young had a better memory before her impairment and that she needed help getting motivated, and that she had "arthritis, panic attacks, can't complete tasks, memory loss, and can't focus and concentrate." Tr. 150. She thought Young could walk one block before resting. However, Young had no problem taking care of herself, cooking for herself, cleaning and performing basic household chores and laundry. The chores took one hour. She left the house to smoke and pay bills and she went to the grocery store twice a month. Her hobbies included jigsaw puzzles, watching television, and reading self-help books.

The ALJ considered this third-party report, but believed the RFC accommodated Young's limitations to the extent reflected in the objective medical evidence. "As such, even if give[n]

great weight, Ms. Thorogood's statements do not provide a basis for altering the above residual functional capacity." Tr. 33.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).

Young misinterprets the function report, arguing that Thorogood observed Young could only perform household chores for one hour a day, when the report indicates Young's chores *took* one hour a day. Tr. 147. Additionally, although Thorogood thought Young could walk only one block at a time before needing to rest, as the ALJ observed, there is no objective medical evidence to support that statement. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (a legitimate reason to discount lay testimony is that it conflicts with medical evidence).

The ALJ accepted Thorogood's statement to the extent reflected in the objective medical evidence. He did not err.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this  21ST  day of February, 2014.

    /s/ Garr M. King
    Garr M. King
    United States District Judge